## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| REBECCA GIALLELLA<br>2013 E St NE, 1<br>Washington, DC 20002<br><br>      Plaintiff,<br><br>   v.<br><br>UNITED PROPERTY MANAGEMENT, INC,<br>8730 NW 36th Ave,<br>Miami, FL 33147<br>Serve On Registered Agent:<br> Lynn Zovluck, 8730 NW 36th Ave,<br> Miami FL 33147<br><br>EQUIFAX INFORMATION SERVICES, LLC<br>1550 Peachtree Street, NW<br>Atlanta GA 30309<br>Serve On Registered Agent:<br> Corporation Service Company<br> 1090 Vermont Ave, NW<br> Washington, D.C. 20005<br><br>EXPERIAN INFORMATION SOLUTIONS, LLC<br>505 City Pkwy West<br>Orange CA 92668<br>Serve On Registered Agent:<br> CT Corporation System<br> 1015 15th St, NW, Suite 1000<br> Washington, D.C. 20005<br><br>      Defendants. | Case No.: 1:23-cv-1978<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

### COMPLAINT

Plaintiff, REBECCA GIALLELLA ("Giallella") files this complaint through undersigned counsel.

1. Plaintiff is a victim of identity theft, and brings this action because Defendants refused to accept this fact and persisted in claiming that Plaintiff owed debts established by the identity thief.

## PARTIES

2. Giallella is a resident of Washington, D.C.

3. Defendant United Property Management, Inc. is a Florida corporation. Its principal office is 8730 NW 36th Ave, Miami, FL 33147. Its registered agent is Lynn Zovluck, 8730 NW 36th Ave, Miami FL 33147.

4. Defendant Equifax Information Services, LLC, is a Georgia limited liability company. Its principal office is in Atlanta, Georgia.

5. Defendant Experian Information Solutions, LLC is an Ohio limited liability company. Its principal office is in Orange, California.

## JURISDICTION

6. This court has subject matter jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

7. Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in this District, where Plaintiff resides.

## THE FAIR CREDIT REPORTING ACT ("FCRA")

8. Congress enacted the FCRA to require the consumer reporting agencies to adopt reasonable procedures for providing consumer credit, personnel, insurance, and other information to those with a legitimate need, in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper use of the information. 15 U.S.C. § 1681b.

9. Under the FCRA, entities that compile information about consumers into

reports used for FCRA-covered purposes, such as deciding whether to grant consumer credit, housing, employment, or insurance, are "consumer reporting agencies" ("CRAs").

10. CRAs compile their files on consumers such as Plaintiff from information furnished by various sources, including businesses that provide their own customers' information to CRAs ("furnishers").

11. The information provided by a furnisher about a consumer's account with the furnisher is referred to by CRAs as a "trade line."

12. Furnishers periodically submit information about consumers accounts to the national credit reporting agencies (Experian, Equifax, and Trans Union) in an electronic format, defined by the Consumer Data Industry Association ("CDIA"), called "Metro 2."

13. CDIA publishes a manual on the Metro 2 format explaining how account data should be reported in Metro 2, called the Consumer Reporting Resource Guide.

14. CRAs take the Metro 2 data provided by furnishers and attempt to match that data to a given consumer's file. From that file, the CRAs then produce a consumer report.

15. When a CRA prepares a consumer report on an individual, it must follow reasonable procedures to "assure maximum accuracy" of the information in the report. 15 U.S.C. § 1681e(b).

16. A consumer has a right to dispute the accuracy of any item in a CRA's file. When a consumer does so, the CRA must reinvestigate—free of charge—to determine whether the information is inaccurate. 15 U.S.C. § 1681i(a).

17. When a CRA conducts any reinvestigation it must review and consider all relevant information submitted by the consumer. 15 U.S.C. § 1681i(a)(4). CRAs cannot

evade this obligation by requiring consumers to submit particular documents or to make disputes in any particular form. Consumer Financial Protection Bureau Circular 2022-07, Nov. 10, 2022.

18. If a reinvestigation finds that information is inaccurate, incomplete, or that it cannot be verified, the CRA must delete that information. 15 U.S.C. § 1681i(a)(5).

19. In addition to their own re-investigation, CRAs must provide a copy of the dispute to the furnisher of the disputed information. The national credit reporting agencies do this through a system called "e-OSCAR".

20. e-OSCAR uses an Automated Consumer Dispute Verification form ("ACDV") to summarize a dispute and the furnisher's response to it.

21. The basis for the consumer's dispute is not fully described in the ACDV, which only contains a numeric dispute code with a brief description, and a copy of the information currently appearing in the consumer's file.

22. e-OSCAR transmits the ACDV form to the furnisher, together with any documents sent with the dispute, and passes the furnisher's response back to the CRA on the same form.

23. After a furnisher receives an ACDV, the furnisher must conduct an investigation with respect to the disputed information and review all relevant information provided by the CRA.

24. After receiving an ACDV, the furnisher must report the results of its investigation to the CRA.

25. If the furnisher's investigation finds that the information is incomplete or inaccurate, it must also report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on

consumers on a nationwide basis. 15 U.S.C. § 1681s-2(b).

26. As happened in this case, CRAs and furnishers habitually conduct little or no investigation into consumer disputes or rely on formulaic standards to accept or reject disputes rather than conducting a genuine search for the truth.

27. As happened in this case, CRAs and furnishers adopt these policies and procedures because automatically rejecting or using procedures that mechanistically judge consumers' disputes allows CRAs and furnishers to save money by employing fewer staff to handle disputes, providing less training to their staff, and outsourcing dispute "investigations" to third-party sub-contractors overseas.

## FACTS

28. Giallella is a victim of identity theft.

29. Giallella owns a home at 2013 E St NE, 1 Washington, DC 20002. Giallella has lived there since 2021.

30. On or about January 4, 2022, an unknown identity thief ("Thief Doe") applied to rent an apartment at Aventura Harbor Apartments, in Miami Beach, Florida in Giallella's name.

31. On that same date, Experian permitted a tenant screening company known as "Resident Verify" to perform a "hard inquiry" of Giallella's credit report.

32. Giallella's Experian file disclosure described hard inquiries in the following terms:

> Hard inquiries are requests for your consumer information based on an action or process initiated by you generally related to a credit or other monetary obligation, such as when you apply for credit, rental property, or utility service, or default on a loan causing it to be sent to a collection agency.

33. Aventura Harbor Apartments is managed by United Properties

Management, Inc. ("UPM").

34. On information and belief, the Resident Verify performed the inquiry on behalf of UPM.

35. On or about January 5, 2022, Thief Doe rented a residential property managed by UPM in Florida.

36. On or about January 6, 2022, Thief Doe opened an account with Florida Power & Light ("FPL") in relation to the Aventura Harbor apartment.

37. On January 6, 2022, FPL obtained Giallella's Equifax credit report, which resulted in a hard inquiry appearing on Giallella's Equifax report.

38. In or about July 2022, UPM furnished information to the CRAs claiming that the lease entered into by Thief Doe in the name of Giallella was in default and that $12,828 was due and owing on the lease.

39. August 2, 2022, Giallella reviewed their Equifax report and saw that the UPM tradeline appeared on it.

40. On August 31, 2022, Giallella wrote to UPM explaining that the lease was fraudulent. As part of the dispute, Giallella included a Federal Trade Commission Identity Theft report, a copy of their Equifax file disclosure, and a copy of their Washington, D.C. driver's license and proof of residence.

41. Giallella's Washington, D.C. driver's license was issued in June 2021, and gave their Washington, D.C. address. The license thus showed Giallella had lived in Washington, D.C. since before the fraudulent rental in Florida began on January 5, 2022.

42. Despite the fact that Giallella had provided UPM with a Federal Trade Commission Identity Theft report, a copy of their Equifax file disclosure and, a copy of their Washington D.C. driver's license, and proof of their residence in Washington, D.C.,

nevertheless on September 14, 2022, UPM sent Giallella an email in which UPM refused to consider Giallella's dispute further without a police report. Specifically, UPM stated that "a copy of a police report regarding the incident is needed to investigate further."

**PLAINTIFF'S CREDIT REPORTING DISPUTES CONCERNING THE UPM TRADELINE — EQUIFAX**

43. On August 31, 2022, Giallella sent a letter to Equifax disputing the following inaccuracies:

   a. The UPM tradeline

   b. The hard inquiry by FPL on January 6, 2022

   c. An Aventura Harbor Apartments Address

   d. A Georgia address.

44. Giallella's dispute included copies of the pertinent credit file disclosure, Giallella's Washington, D.C. driver's license, and the FTC identity theft report.

45. On information and belief, Equifax forwarded Giallella's dispute to UPM.

46. On information and belief UPM responded to the Equifax dispute indicating the information it had furnished was accurate.

47. On September 15, 2022, Equifax responded to the dispute by removing the disputed addresses from Giallella's credit file but maintained the FPL hard credit inquiry and the UPM tradeline. In its response, Equifax said "WE VERIFIED THAT THIS ITEM BELONGS TO YOU."

48. On information and belief when UPM responded to Giallella's dispute it updated its reporting to Equifax by incorrectly identifying the type of account it was reporting. UPM reported the account as "Real Estate."

49. In the Metro 2 format used by Equifax, a two-digit numeric code indicates

account type. According to the Consumer Data Industry Association's Consumer Reporting Resource Guide ("CRRG"), the code "08" denotes "Real estate, specific type unknown" and notes "Report specific real estate type codes when known, refer to code 19, 25, 26, 6B, 2C."

50. According to the CRRG, the codes to which Equifax refers mean the following:

| Code | Means |
| --- | --- |
| 19 | FHA Real Estate Mortgage |
| 25 | VA Real Estate Mortgage |
| 26 | Conventional Real Estate Mortgage |
| 6B | Commercial Mortgage Loan |
| 2C | USDA Real Estate Mortgage Loan |

51. The Consumer Reporting Resource Guide specifically identifies the 08 code as for accounts that are secured by real property, rather than for residential leases.

52. Equifax included the UPM tradeline in the "Mortgages" section of its file disclosure to Giallella, along with Giallella's genuine home mortgage.

53. As a result of this erroneous reporting, Equifax stated that Giallella had two residential mortgages when in fact there was only one.

54. Thus, the Metro 2 code designation "08" as "real estate" indicates that there is a loan secured by real property.

55. In contrast to the "08" code which indicates a mortgage, Metro 2 uses different codes to indicate an obligation related to leases or rentals:

| Code | Means |
|---|---|
| 13 | Lease (Non-auto) |
| 29 | Rental Agreement |

56. When it listed "08" instead of "13" or "29" on Metro 2, UPM thus inaccurately represented that UPM's fraudulent rental debt was actually a mortgage of some unknown type that belonged Giallella.

57. Instead of deleting this inaccurate information, Equifax said in its response to Giallella that the FPL inquiry was "A FACTUAL RECORD OF FILE ACCESS" and told Giallella to "CONTACT THE CREDITOR DIRECTLY AND FOLLOW THEIR INTERNAL FRAUD PROCEDURES."

58. On information and belief, after Equifax refused to delete the FPL inquiry, FPL itself directed the deletion of the inquiry because of Giallella's direct dispute to FPL.

59. On December 26, 2022, Giallella sent another letter to Equifax disputing the UPM tradeline. Giallella pointed out UPM's tradeline incorrectly appeared as a mortgage on their credit report, and that it was fraudulent.

60. On January 13, 2023, Equifax responded to Giallella refusing to delete the UPM tradeline and stated that "the information you disputed has been verified as accurate" but that unrelated information had been updated. It went on to say "WE VERIFIED THAT THIS ITEM BELONGS TO YOU"

61. On February 23, 2023, Giallella sent a new credit reporting dispute to Equifax. Giallella pointed out that UPM was falsely reporting the account as a "real estate" account.

62. On March 13, 2023, Equifax responded by stating that "THE DISPUTED

ITEM IS NOT CURRENTLY REPORTING ON THE EQUIFX [sic] CREDIT FILE."

63.  Equifax attached to its March 13, 2023, response a file disclosure showing that UPM tradeline still appeared on Giallella's Equifax report:

| UNITED PROPERTY MANAGEMENT INC | 3211 PONCE DE LEON BLVD Coral Gables FL 331347274 : |
|---|---|

| Account Number | | Date Opened | High Credit | Credit Limit | Terms Duration | Terms Frequency | | Months Revd | Activity Designator | | Creditor Classification | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *10BL | | 01/05/2022 | $21,840 | | 12 Months | Biweekly | | | | | | |
| Date of Last Reported Update | Balance Amount | Amount Past Due | Date of Last Payment | Actual Payment Amount | Scheduled Payment Amount | Date of 1st Delinquency | Date of Last Activity | Date Maj Del. 1st Reported | Charge Off Amount | Deferred Pay Start Date | Balloon Pay Amount | Balloon Pay Date | Date Closed |
| 01/13/2023 | $12,828 | $12,828 | 01/2022 | | $500 | | 03/2022 | | | | | | |

Status - Over 120 Days Past Due; Type of Account - Installment; Type of Loan - Real Estate; Whose Account - Individual Account; ADDITIONAL INFORMATION - Lease; Fixed Rate; 150 Days Past Due;

**Historical Account Information**

| | Balance | Scheduled Payment Amount | Actual Payment Amount | Date of Last Payment | High Credit | Credit Limit | Amount Past Due | Type of Loan | Activity Designator |
|---|---|---|---|---|---|---|---|---|---|
| 02/23 | No Data Available | | | | | | | | |
| 01/23 | $12,828 | $500 | | 01/01/2022 | $21,840 | | $12,828 | Real Estate | |
| 12/22 | No Data Available | | | | | | | | |
| 11/22 | No Data Available | | | | | | | | |
| 10/22 | No Data Available | | | | | | | | |
| 09/22 | $12,828 | $500 | | 01/01/2022 | $21,840 | | $12,828 | Real Estate | |
| 08/22 | No Data Available | | | | | | | | |
| 07/22 | $12,828 | $500 | | 01/01/2022 | $21,840 | | $12,828 | Lease | |

64.  On information and belief, Equifax transmitted each of Giallella's disputes to UPM in the form of an ACDV.

65.  On information and belief, UPM responded to each ACDV with a code that verified the UPM tradeline as accurate, or that the tradeline required unrelated changes which did not affect its claim that the tradeline was accurate.

66.  On information and belief, UPM failed to conduct a reasonable reinvestigation in each instance before verifying the tradeline as accurate. This is based on the fact that UPM refused to investigate Giallella's complaint of identity theft without a police report, and on the fact that UPM reported the UPM tradeline as "real estate" (i.e.,

a mortgage) rather than a lease.

67. Further, UPM and Equifax failed to mark the UPM tradeline as disputed, despite Giallella's repeated disputes.

68. Equifax failed in its obligations to Plaintiff by not conducting a proper reinvestigation into Plaintiff's claims of identity theft, choosing instead to blindly believe UPM, regardless of the evidence provided by Plaintiff.

69. Equifax ignored facts that showed Plaintiff was not responsible for the UPM tradeline, and acted inconsistently in its handling of Plaintiff's disputes:

   a. Equifax deleted the Aventura Harbor Apartments address which, on information and belief, was associated with the UPM tradeline, but refused to delete the tradeline itself.

   b. Equifax knew that FPL had deleted its hard inquiry, after Equifax had refused to do so, which is a further indication that a neutral third-party had determined that Giallella's claims of fraud were true.

   c. Equifax ignored the fact that Giallella's Washington, D.C. driver's license showed that Giallella had lived in Washington D.C. since before the UPM tradeline's date of opening. Equifax thus chose not only to believe UPM's unsupported word over that of Giallella, but also over the official records of Washington, D.C.

70. UPM failed in its obligations to Plaintiff by not conducting a proper investigation into Giallella's claims of identity theft, choosing instead to insist that Giallella is responsible for a debt created by an identity thief.

**PLAINTIFF'S CREDIT REPORTING DISPUTES TO EXPERIAN**

71. On August 31, 2022, Giallella also sent a letter to Experian disputing the

inclusion of an Ellenton, Florida address and a January 4, 2022 hard credit inquiry by Resident Verify on behalf of Aventura Harbor Apartments.

72. On September 12, 2022, Experian responded to the dispute by removing the disputed addresses from Giallella's credit file, but maintaining the Resident Verify hard credit inquiry.

73. On December 26, 2022, Giallella sent another letter to Experian disputing the fraudulent hard inquiry from Resident Verify. Giallella pointed out that a hard inquiry presents the false impression that Giallella actually applied for credit, which was not true.

74. On January 6, 2023, Experian responded to Giallella that it required additional proof of identity, even though Experian had previously responded substantively to a dispute about the same information in Giallella's credit file.

75. On February 23, 2023, Giallella sent another letter to Experian disputing the Resident Verify hard inquiry, attaching additional proof of identity.

76. On information and belief, Experian did not notify Resident Verify of Giallella's dispute about the hard inquiry.

77. Despite the fact that Giallella had provided additional proof of identity as requested, Experian still refused to delete the Resident Verify inquiry.

78. Experian failed in its obligation to have reasonable procedures to ensure the maximum possible accuracy of its credit reports regarding Giallella, because it lacked a reasonable procedure for the investigation and removal of a credit inquiry challenged as fraudulent or inaccurate because the person who allegedly authorized the inquiry (in this case, Giallella) never did so.

79. Experian failed in its obligation to investigate Giallella's dispute regarding the inaccuracy of the Resident Verify inquiry.

## DAMAGES

80. As a proximate cause of the illegal acts of the Defendants, Giallella has incurred actual economic and noneconomic damages including but not limited to the following:

   a. Giallella has spent time and money trying to have the fraudulent accounts removed from credit reports.

   b. Giallella experienced emotional distress with accompanying physical manifestations, in particular:

      i. Distraction from everyday matters and interference with ability to concentrate due to the worries caused by the negative, fraudulent, false, and inaccurate credit reporting;

      ii. Crying;

      iii. Stress;

      iv. Anxiety;

      v. Frustration;

      vi. Arguments with family;

      vii. Weight gain;

      viii. Distraction from and loss of interest in normal everyday activities.

**COUNT I.   Fair Credit Reporting Act 15 U.S.C. §§ 1681e(b) & 1681i(a) – Experian**

81. Plaintiff repeats the foregoing allegations as though fully set forth here.

82. Plaintiff is a consumer within the meaning of 15 U.S.C. § 1681a(c) because Plaintiff is an individual.

83. Experian is a Consumer Reporting Agency within the meaning of 15 U.S.C.

§ 1681a(f) because they are persons who "for monetary fee . . . regularly engages . . . in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties and . . . use[] . . . means . . . of interstate commerce for the purpose."

84. Experian is required to "follow reasonable procedures to assure maximum possible accuracy of the information" when preparing a consumer report. 15 U.S.C. § 1681e(b).

85. Experian prepared consumer reports concerning Plaintiff after Plaintiff had disputed the fraudulent accounts.

86. Experian included in its consumer reports false and inaccurate information despite Plaintiff's disputes.

87. On information and belief, Experian failed to follow reasonable procedures to assure maximum possible accuracy in its reports concerning Plaintiff.

88. On information and belief, Experian's policy is not to delete fraudulent hard credit inquiries because of a consumer's allegations of identity theft.

89. On information and belief, Experian's policy is not to forward disputes regarding fraudulent hard credit inquiries to the entity that made the inquiry.

90. On information and belief, Experian's policies allow inconsistent and irrational treatment of disputed inquiries in relation to disputed accounts.

91. Experian acted inconsistently and irrationally when it deleted the Aventura Harbor Apartments address but refused to delete the related fraudulent hard inquiry.

92. The hard inquiry is inaccurate because it indicates not only that the named entity obtained Plaintiff's credit report, but also indicates that it did so *in connection with an application by Plaintiff*. Plaintiff made no application to Aventura Harbor Apartments

or Resident Verify.

93. Experian acted willfully in failing to follow reasonable procedures.

94. Experian had an obligation to "conduct a reasonable reinvestigation to determine whether the disputed information [was] accurate" within 30 days from receipt of the dispute. 15 U.S.C. § 1681i(a)(1)(A).

95. Experian failed to conduct such a reinvestigation, instead applying a blanket policy of refusing to delete disputed hard credit inquiries.

96. Experian's blanket policy of refusing to delete hard inquiries is inconsistent with assuring maximum possible accuracy.

97. Experian had an obligation to delete or modify any information "found to be inaccurate or incomplete or [which] cannot be verified."

98. Experian did not delete the fraudulent inquiry, and the truth of the information (that Giallella had applied for credit) could not be verified (because the alleged application by Giallella never occurred and was in fact a fraudulent authorization by Thief Doe).

99. Experian acted willfully in failing to conduct a reasonable reinvestigation and failing to delete unverifiable information.

100. Plaintiff was damaged as aforesaid.

**Wherefore**, Plaintiff seeks the following relief:

A. An amount to be determined by the jury for compensatory damages in an amount in excess of $75,000;

B. Statutory damages as prescribed by the Fair Credit Reporting Act;

C. An amount of punitive damages to be determined by the jury in excess of $75,000;

D. An award of costs and reasonable attorneys' fees to Plaintiff;

E. Such other and further relief the nature of the Plaintiff's cause may require.

**COUNT II. Fair Credit Reporting Act 15 U.S.C. §§ 1681e(b) & 1681i(a) – Equifax**

101. Plaintiff repeats the foregoing allegations as though fully set forth here.

102. Plaintiff is a consumer within the meaning of 15 U.S.C. § 1681a(c) because Plaintiff is an individual.

103. Equifax is a Consumer Reporting Agency within the meaning of 15 U.S.C. § 1681a(f) because they are persons who "for monetary fee . . . regularly engages . . . in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties and . . . use[] . . . means . . . of interstate commerce for the purpose."

104. Equifax were required to "follow reasonable procedures to assure maximum possible accuracy of the information" when preparing a consumer report. 15 U.S.C. § 1681e(b).

105. Equifax each prepared consumer reports concerning Plaintiff after Plaintiff had disputed the fraudulent accounts.

106. Equifax included in its consumer reports false information despite Plaintiff's disputes.

107. On information and belief, Equifax failed to follow reasonable procedures to assure maximum possible accuracy in its reports concerning Plaintiff.

108. On information and belief, it is Equifax's policy to parrot the responses transmitted to them by furnishers through the e-OSCAR system.

109. The e-OSCAR system provides for no narrative response by furnishers, and

Equifax receives no evidence, documentation or explanation for the responses given to a dispute by furnishers.

110. On information and belief, it is Equifax's policy not to require evidence, documentation, or explanation from a furnisher, even when a disputing consumer has attached documentary evidence.

111. On information and belief, Equifax's policies failed to make a reasonable assessment of the reliability of UPM as a furnisher, particularly considering its inaccurate reporting of the account type of the tradeline.

112. Equifax knew or should have known that UPM had submitted facially inaccurate and irreconcilable information about the UPM tradeline. For example, UPM reported that the tradeline was opened on January 5, 2022, but that the last payment occurred on January 1, 2022, which was four days prior to when the account was opened. Further, UPM reported that the type of account was "Lease" in July 2022, but then changed it to "Real Estate" in September 2022, while at the same time noting "ADDITIONAL INFORMATION – Lease."

113. Equifax knew or should have known that Plaintiff disputed the UPM tradeline based on Plaintiff's repeated disputes and should have marked the tradeline "disputed" accordingly.

114. Equifax acted willfully in failing to follow reasonable procedures.

115. Equifax had an obligation to "conduct a reasonable reinvestigation to determine whether the disputed information [was] accurate" within 30 days from receipt of the dispute. 15 U.S.C. § 1681i(a)(1)(A).

116. Equifax failed to conduct such an investigation, instead parroting the responses of UPM.

117. Equifax had an obligation to delete or modify any information "found to be inaccurate or incomplete or [which] cannot be verified."

118. Equifax did not delete the UPM tradeline, despite the fact that the truth of the information in the tradeline could not be verified.

119. Equifax acted willfully in failing to conduct a reasonable reinvestigation and failing to delete unverifiable information.

120. Plaintiff was damaged as aforesaid.

**Wherefore**, Plaintiff seeks the following relief:

A. An amount to be determined by the jury for compensatory damages in an amount in excess of $75,000;

B. Statutory damages as prescribed by the Fair Credit Reporting Act;

C. An amount of punitive damages to be determined by the jury in excess of $75,000;

D. An award of costs and reasonable attorneys' fees to Plaintiff;

E. Such other and further relief the nature of the Plaintiff's cause may require.

**COUNT III.**  **Fair Credit Reporting Act 15 U.S.C. §1681s-2(b) – Defendant UPM**

121. Plaintiff repeats the foregoing allegations as though fully set forth here.

122. UPM is a furnisher of information to the CRA Defendants.

123. UPM had an obligation under § 1681s-2(b) to conduct a reasonable investigation of any dispute transmitted to it by a CRA.

124. UPM violated § 1681s-2(b) by conducting only a superficial, unreasonable investigation, or no investigation at all.

125. UPM acted willfully in failing to investigate because it knew it had an

obligation to investigate credit reporting disputes, and on information and belief, adopted a policy of refusing to investigate identity theft inquiries without a police report.

126. UPM acted willfully in failing to investigate because, on information and belief, if failed to carry out any reasonable investigation. This is based in part on UPM's incorrect update of the tradeline to indicate that it was a "Real Estate" tradeline rather than a "Lease," and its failure to correct the type of tradeline it was reporting when Giallella asserted this error in a dispute.

127. UPM acted willfully in failing to report the tradeline as disputed because it had knowledge that Giallella had sent repeated disputes regarding the tradeline.

128. UPM acted willfully in failing to investigate when it knew it had an obligation to investigate credit reporting disputes but failed to conduct a careful review of the documents in its possession, including Giallella's proof that Giallella had lived in Washington, D.C. since before the fraudulent rental.

129. Plaintiff was damaged as aforesaid.

**Wherefore**, Plaintiff seeks the following relief:

A. An amount to be determined by the jury for compensatory damages in an amount in excess of $75,000;

B. Statutory damages as prescribed by the Fair Credit Reporting Act;

C. An amount of punitive damages to be determined by the jury in excess of $75,000;

D. An award of costs and reasonable attorneys' fees to Plaintiff;

E. Such other and further relief the nature of the Plaintiff's cause may require.

## JURY DEMAND

Plaintiff demands a trial by jury.

                By:    /s/ Emanwel J. Turnbull
                        Emanwel J. Turnbull
                        *Pro Hac Vice Pending*
                        Peter A. Holland
                        *Pro Hac Vice Pending*
                        THE HOLLAND LAW FIRM, P.C.
                        914 Bay Ridge Rd, Ste 230
                        Annapolis, MD 21403
                        Telephone: (410) 280-6133
                        Facsimile: (410) 280-8650
                        eturnbull@hollandlawfirm.com
                        peter@hollandlawfirm.com

                        /s/ Scott C. Borison
                        Scott C. Borison
                        Bar No. 443982
                        BORISON FIRM LLC.
                        5830 East Second Street
                        #95943
                        Casper, WY 82609